UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO: 16-068 |
| v. | * | SECTION: "R" |
| JONATHAN LAWRENCE | * | |
| | * * * | |

FILED APR 24 2019
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
WILLIAM W. BLEVINS
CLERK

<u>FACTUAL BASIS</u>

The above-named defendant, **JONATHAN LAWRENCE** ("**LAWRENCE**"), has agreed to plead guilty to Count One, Count Two, and Count Nine of the Superseding Indictment. Should this matter proceed to trial, the United States would prove beyond a reasonable doubt the facts set forth in this Factual Basis. Unless stated otherwise, these acts occurred in the Eastern District of Louisiana:

I. **Drug Offenses**

During the timeframe of the drug conspiracy, **LAWRENCE**, Brandon HALL, Aloysius KORIEOCHA, Donald MARCELIN, Brian MAXSON, Dwayne LABRANCH, Lance STOVALL, Vonzo MAGEE, and others, conspired to distribute heroin and fentanyl throughout the New Orleans area. These individuals were members of a drug-trafficking organization that operated primarily in the Eastside Hollygrove neighborhood of New Orleans. Collectively, the group referred to their neighborhood as "The Zoo," a name derived from a popular rap song/video filmed in the neighborhood. Each of the eight defendants has been linked to drug activity in Eastside Hollygrove through law enforcement controlled purchases, Title III wire and electronic interceptions, witness statements, drug seizures, and other evidence. Numerous civilian witnesses, many of whom were customers of **LAWRENCE, HALL, KORIEOCHA,**

MARCELIN, MAXSON, LABRANCH, STOVALL, and MAGEE, have provided information about purchasing narcotics from one or more of these defendants.

Between December 2015 and January 2016, agents used a confidential source (CS1) to conduct four controlled purchases of heroin from **LAWRENCE**. Each controlled purchase involved between one gram and seven grams of heroin. Each controlled purchase occurred in the Eastside Hollygrove neighborhood. Three of the controlled purchases involved a direct sale of heroin from **LAWRENCE** to CS1. In one controlled purchase, **LAWRENCE** directed CS1 to purchase heroin from codefendant, Donald MARCELIN. To set up that purchase, on December 15, 2015, CS1 called **LAWRENCE** and stated, "I need a ball," which, through previous interactions with **LAWRENCE**, CS1 knew to be an eighth of an ounce of heroin. **LAWRENCE** responded, "A ball? Hey, call me people at that, um, number, 3-2-0." Through prior experience, CS1 knew that **LAWRENCE** was directing CS1 to call MARCELIN. CS1 called MARCELIN and they agreed to meet behind "the van," in the area of Peach and Monroe Street in New Orleans. There, CS1 met MARCELIN, who exchanged approximately 2.63 grams of a compressed brownish powder for the controlled purchase money.

After the controlled purchases, agents obtained authority from United States District Court Judge Kurt D. Engelhardt to execute two Title III warrants on **LAWRENCE**'s cellular phone. The first interception period was from February 18, 2016, through March 18, 2016. The second interception period began on April 14, 2016. Interception was ceased on April 22, 2016, after agents decided to arrest **LAWRENCE**, HALL, MARCELIN, and MAXSON, after a shooting incident involving Victim A (discussed below). During both interception periods, agents intercepted numerous phone calls and text messages involving discussions between **LAWRENCE** and his codefendants in furtherance of their joint drug-trafficking organization.

2

Interceptions over **LAWRENCE**'s phone showed that members of the group sold heroin seemingly every day. Some of the conversations were overtly drug-related, and, in some cases, involved discussions of significant quantities of heroin. For example, on February 21, 2016, **LAWRENCE** told an unknown male that he was waiting for his Houston-based supplier (Supplier A) to quote him a price for the "whole block," meaning one kilogram of heroin. **LAWRENCE** later told Supplier A that he wanted to pay "60" for the block, meaning $60,000. In these conversations, **LAWRENCE** also stated that he had a "test driver" on deck, *i.e.*, a user who would test the quality of the heroin. In another conversation, **LAWRENCE** provided a customer with the prices he charged for heroin, specifically noting his price for a "gram," an eight-ball (or one-eighth of an ounce), and a quarter-ounce.

Codefendant **MARCELIN** was instrumental in helping **LAWRENCE** serve drug customers. The Title III interceptions captured numerous drug communications between **LAWRENCE** and **MARCELIN**. On March 18, 2016, in a typical exchange, **LAWRENCE** placed a call to an unidentified customer. During that call, **LAWRENCE** inquired, "What do you want to do, so that I could be ready, homie?" The unidentified man said, "I don't know, just like a little ball [*i.e.*, an eight-ball], I'm trying to test drive it." The unidentified man then asked, "What is the ticket going to be?" and **LAWRENCE** responded, "Two seventy five," meaning $275, consistent with the price for an eighth of an ounce of heroin. Later in conversation, **LAWRENCE** told the unidentified man that he was willing to sell "quarters for five, balls for two fifty, that's only if you fuck with me consistently, though." **LAWRENCE** then stated, "I'm a put the ball in your hand, you heard me. I'm gonna give you the ball for two fifty, and let you go from there. Then you let me know where we go at from there." In the

3

very next phone call, **LAWRENCE** called MARCELIN and instructed him, "Put me a ball together, I'm about to come through." MARCELIN responded, "Alright."

In another call on February 19, 2016, **LAWRENCE** called MARCELIN and asked, "Where you put the smack?" "Smack" is a slang term for heroin. MARCELIN responded that it was "in the drawer." On April 15, 2016, in another phone call with a customer, the customer told **LAWRENCE** that he was "coming to get another one." **LAWRENCE** told the customer to call "Snook," one of the aliases for MARCELIN. In a subsequent call, **LAWRENCE** advised MARCELIN that the customer was about to meet with MARCELIN. **LAWRENCE** noted, "They want a ball. You got enough for them?"

Codefendant MAXSON also worked with **LAWRENCE** on a number of drug deals, and they frequently discussed their drug business over **LAWRENCE**'s phone. In a series of phone calls on March 16, 2016, **LAWRENCE** and MAXSON discussed a deal to sell 7 grams to a customer for $800. In one particular call that day, MAXSON, who self-identified as his nickname "Chin," explained that he had lined up a deal to sell 7 grams for $800. MAXSON stated that, for this deal, **LAWRENCE** would get $400 and MAXSON would get $400. MAXSON explained that he wanted buy 6 grams of narcotics from **LAWRENCE**, and that he intended to add 1 gram of cut to the 6 grams. In another call, on April 14, 2016, MAXSON called **LAWRENCE** and stated that he was in "the Zoo." MAXSON told **LAWRENCE** to call "Golfer" (MARCELIN) and ask MARCELIN to "give me one like last time . . . I got you next time I see you." Shortly thereafter, **LAWRENCE** called MARCELIN and told MARCELIN to "give Chin a ball for me." On April 18, 2016, a female customer called **LAWRENCE** to complain about MARCELIN not answering his phone. **LAWRENCE** advised the female to "call Chin." The female then complained that Chin "is all short on

4

everything . . . everything is small and it's garbage as shit." The female noted that LAWRENCE had been "acting funny for weeks," and that all she was trying to do was "spend our money and get our shit [*i.e.*, narcotics]."

LAWRENCE also worked with codefendant HALL to service drug customers in the neighborhood. During one call, on March 7, 2016, LAWRENCE told HALL that he had "two white boys," who were customers, waiting for him. HALL responded that he took care of them. During another call, on February 24, 2016, HALL complained to LAWRENCE that MARCELIN was getting sloppy because one of LAWRENCE's customers, Armond, had just approached HALL.

Codefendant KORIEOCHA was an older, more established figure in the drug operation within Eastside Hollygrove. During the timeframe of this conspiracy, LAWRENCE and KORIEOCHA worked together to distribute narcotics. On February 21, 2016, agents intercepted a phone conversation between LAWRENCE and MAXSON, where LAWRENCE told MAXSON that "Ball," *i.e.*, KORIEOCHA, had 1000 Ecstasy pills to sell him. LAWRENCE agreed to keep the pills until MAXSON could meet him. On April 17, 2016, while LAWRENCE was in the hospital, in an intercepted communication, MARCELIN called LAWRENCE and asked if he should talk to "Ball," *i.e.*, KORIEOCHA, about "rotating," or if he should just be "on hold." Later in the day, MARCELIN and LAWRENCE talked again, and MARCELIN claimed that "Ball" gave him "the whole thing," meaning a quantity of narcotics. MARCELIN also said that he gave KORIEOCHA money "from the last ticket," *i.e.*, the last sale of drugs. In these communications, MARCELIN was stating that, because LAWRENCE was in the hospital and unavailable to oversee his drug activities, MARCELIN was continuing to work with KORIEOCHA in LAWRENCE's absence. On April 20, 2016, in

an intercepted communication, codefendants MARCELIN and **LAWRENCE** discussed selling eight-ball quantities (or approximately 3.5-gram quantities) of narcotics to their drug customers. During the call, **LAWRENCE** stated that he received some "new shit from Ball," *i.e.*, KORIEOCHA, and asked MARCELIN "how much you got left" of the previous supply. In this call, **LAWRENCE** was stating that he received new heroin from KORIEOCHA, and that he was intending to distribute the new heroin through MARCELIN. KORIEOCHA was aware that **LAWRENCE** had made efforts to purchase one kilogram or more of heroin in furtherance of their drug operation.

Codefendant LABRANCH also worked with **LAWRENCE** to distribute narcotics. LABRANCH lived in a house (3939 Hamilton Street, in Eastside Hollygrove) that was frequently used to package and stash heroin sold by **LAWRENCE** and others. The group also used 3939 Hamilton Street residence to store firearms and ammunition. In addition, LABRANCH was intercepted in communications with **LAWRENCE** acting in furtherance of their drug conspiracy. For example, on February 21, 2016, LABRANCH warned **LAWRENCE** about "them people," *i.e.*, a police presence, that "just rolled past" in the neighborhood.

Codefendant STOVALL conspired with **LAWRENCE** to sell narcotics. STOVALL was the subject of numerous intercepted communications over **LAWRENCE**'s phone. For example, on March 4, 2016, a female drug customer asked **LAWRENCE** for "Allen's" number. Allen is a nickname for STOVALL. The female customer noted that STOVALL had just served "Casey" with a quantity of narcotics. **LAWRENCE** provided the female customer with STOVALL's known phone number. On April 20, 2016, **LAWRENCE** told MARCELIN that he had been sending a customer to "LeLe," another nickname for STOVALL. On April 21, 2016,

6

LAWRENCE directed another female customer to STOVALL, providing STOVALL's phone number.

Agents intercepted a number of communications on **LAWRENCE's** phone which provided evidence of codefendant MAGEE's drug activities. For example, on February 26, 2016, MAGEE texted **LAWRENCE**, "U up n running if so my ppl tryn get yea fwm cadlaic." MAGEE then called **LAWRENCE** to talk about "Cadillac," which is a type of heroin that MAGEE was trying to serve to customers. On April 16, 2016, MAGEE texted **LAWRENCE**, "Yo fwm I'm at bout a rack [*i.e.*, meaning MAGEE had sold $1,000 of heroin] look out for me." Then, "Yo wya with it." **LAWRENCE** responded, "Zoo." MAGEE then called **LAWRENCE** and stated, "Golfer [Marcelin] came through with it." MARCELIN then called **LAWRENCE** and stated that he "took care of him," in that he provided MAGEE with further supply of narcotics.

**LAWRENCE** and his coconspirators were a tight-knit group that worked together to evade law enforcement detection. On March 2, 2016, in a series of intercepted communications, MAXSON told **LAWRENCE** that he had learned that federal authorities were investigating the drug activities of the group. MAXSON and **LAWRENCE** agreed to convene members of the conspiracy in Hollygrove to discuss what MAXSON had learned. A subsequent meeting was arranged in Hollygrove with several members of the group. To arrange this meeting, **LAWRENCE** had contacted KORIEOCHA, MARCELIN, HALL, and MAXSON. Surveillance agents saw these individuals, as well as LABRANCH, attend the meeting.

**LAWRENCE** and the government stipulate for the purposes of sentencing that **LAWRENCE** was responsible for between 1 kilogram and 3 kilograms of a mixture or

7

substance containing heroin, through **LAWRENCE's** own conduct and the reasonably foreseeable conduct of his co-conspirators.

## II. Firearm Offenses

**LAWRENCE, HALL, LABRANCH, MAXSON, MAGEE,** and others conspired to possess firearms in furtherance of their drug-trafficking activities, and often discussed firearms during intercepted communications. For example, on February 28, 2016, **LAWRENCE** called **MAXSON** and asked, "You still get D-Allen number? He still got that stick?" A "stick" is a slang term for a rifle. **MAXSON** responded, "Let me call him and hit you right back." A short time later, **MAXSON** called **LAWRENCE** and stated, "Nigga wanted two hand things." A "hand thing" is a slang term for a handgun. In these conversations, **MAXSON** was attempting to assist **LAWRENCE** in acquiring a rifle, which would require **LAWRENCE** to trade two handguns.

Members of the group were involved in two shootings targeting Victim A. The shootings occurred on March 8, 2016, and April 16, 2016. Victim A was a rival drug dealer who associated with a separate group of individuals that had drug-related disputes with members of **LAWRENCE's** Eastside Hollygrove group. Victim A was not hit during the first shooting, but was shot in the lower left leg during the second shooting.

On March 8, 2016, **LAWRENCE, HALL, LABRANCH,** and others were involved in the shooting of Victim A. The shooting occurred in front of Mel's Food Store, at the corner of General Ogden and Marks Street in the Hollygrove neighborhood. This store is directly across

the street from Mary McLeod Bethune Elementary School of Literature & Technology. The discharge of firearms occurred within 1,000 feet of school grounds.

On March 7 and March 8, 2016, before the shooting, agents intercepted a number of calls between **LAWRENCE**, **HALL**, and **LABRANCH** in furtherance of and to coordinate the shooting. In one set of calls, **LAWRENCE** and HALL discussed obtaining WD-40 in order to "clean the rust off" of the firearms that they intended to use in the shooting. In another set of calls on March 7 and March 8, HALL indicated to **LAWRENCE** that he had obtained a tan Chevrolet Trailblazer. In these calls, the group discussed that they were attempting to hide the Trailblazer, and suggested that they intended to use the Trailblazer for illegal activity. Agents conducted surveillance and identified the Trailblazer in the Hollygrove neighborhood. Agents determined that the Trailblazer had recently been reported stolen.

On March 8, agents established surveillance to observe the Trailblazer, which was parked behind the Costco market, near Palmetto Street in New Orleans. Minutes before the shooting, **LAWRENCE** and **LABRANCH** discussed meeting up. On one call, **LAWRENCE** asked LABRANCH where he was. LABRANCH stated that he was by the "store," meaning Mel's Food Store. **LAWRENCE** then asked, "He's out there?" **LAWRENCE** was referring to Victim A. LABRANCH replied, "Yes." **LAWRENCE** then directed LABRANCH to meet by the Trailblazer.

At the time, agents had set up surveillance down the street from the Trailblazer. Agents observed a Kia Sorrento—consistent with the car **LAWRENCE** often drove—pull up next to the Trailblazer. An individual exited the Kia and entered the Trailblazer. Both cars then departed the Palmetto Apartments area. Agents followed the Trailblazer until it entered the Eastside Hollygrove neighborhood, at which time they terminated surveillance.

9

Minutes later, at approximately 3PM, agents received reports that there had just been a shooting in front of Mel's store. Surveillance video from a pole camera in the neighborhood showed the same tan Trailblazer drive next to the store. At least three individuals were inside of the car. Victim A, who was standing in front of Mel's, was the intended target of the shooting. Victim A was not hit by gunfire, and shot back at his assailants as he fled. Spent casings of four different types of ammunition were recovered from the scene.

In intercepted communications immediately after the shooting, LABRANCH called **LAWRENCE** and stated, "Yao got grazed." "Yao" is a nickname for another individual who associated with the Eastside Hollygrove group, hereinafter Associate A. In another call approximately an hour and a half after the shooting, **LAWRENCE** told an unknown male, "Nigga got at Fresh." When the unknown male asked, "Who?" **LAWRENCE** replied, "You already know." Victim A's nickname is "Fresh."

Over the course of the afternoon, numerous individuals, including HALL, informed **LAWRENCE** that they should not go into the neighborhood because police were there investigating the shooting. At approximately 6:30PM, **LAWRENCE** asked LABRANCH if he had something to clean the "whatchamacallit." **LAWRENCE** was referring to cleaning the firearm that was used in the shooting. Later that night, **LAWRENCE** had another conversation with an unknown male. During the conversation, **LAWRENCE** acknowledged that "something went down in the hood." **LAWRENCE** stated "Fresh," and then noted "that bitch got nine lives."

On March 9, 2016, in an intercepted call between **LAWRENCE** and HALL, HALL told **LAWRENCE** that **LAWRENCE** needed a new "stick," and that the one he had was "whammy." **LAWRENCE** responded that "it hit like eight" and that he would have to "check

and see." The term "stick" was street slang for a rifle. In this call, HALL referred to the rifle as "whammy" to mean that it was not a well-functioning gun. Furthermore, when LAWRENCE stated that "it hit like eight," he meant that the gun discharged at least eight times and that he would check the magazine to confirm how many shots were fired.

The second shooting occurred on April 16, 2016, at the intersection of Monroe Street and Airline Highway. LAWRENCE was aware that Victim A had traveled into the Eastside Hollygrove neighborhood that day. At 5:20pm, LAWRENCE called HALL. LAWRENCE was in a hurry. HALL told LAWRENCE that he was getting his "gear," meaning his firearm. LAWRENCE responded that HALL was taking too long and "that man [*i.e.*, Victim A] will be gone." At approximately 5:30pm, LAWRENCE talked with a male associate. LAWRENCE told the male associate that he needed to be his "eyes . . . ASAP."

In a text exchange minutes before the shooting, LAWRENCE texted Associate A: "FRESH." As noted, "Fresh" is a nickname for Victim A. Associate A responded, "No cuz just do it better, that's all." In this text, Associate A, who was "grazed" during the first attempt to shoot Victim A, was wishing LAWRENCE success on the second attempt to shoot Victim A.

At approximately 6:30PM, police were alerted to a shooting at Peach Street and Monroe Street. A car linked to Victim A had been left at the scene. Police located a gun inside the vehicle. Victim A's friend had transported Victim A to University Hospital with a gunshot wound to his leg.

In calls intercepted after the shooting, LAWRENCE attempted to regroup with members of the Eastside Hollygrove group. In one call, an unidentified male asked LAWRENCE, "You hit him Mego?" "Mego" is a nickname for LAWRENCE. In another call, LAWRENCE informed an associate that he was accidentally shot by "Hilly," a nickname for HALL. Shell

11

casings from at least two different firearms were collected at the scene, including rifle shell casings with the same manufacturer as in the March 8 shooting. Both **LAWRENCE** and **HALL** discharged firearms during the shooting of Victim A. **LAWRENCE** was, in fact, accidentally shot in the hand by **HALL** as they both attempted to shoot Victim A. **LAWRENCE** checked into a hospital in St. Charles the day after the shooting with an injury to his hand. **LAWRENCE** fabricated a story to the hospital staff about how he was injured.

### Limited Nature of Factual Basis

This proffer of evidence is not intended to constitute a complete statement of all facts, but rather is a minimum statement of facts intended to prove the necessary factual predicate for the guilty plea. The limited purpose of this proffer is to demonstrate that there exists a sufficient legal basis for **LAWRENCE**'s plea of guilty to the charged offense.

_____  4/23/19
Brandon S. Long                  (Date)
Assistant United States Attorney


_____  11-16-18
Patrick Lindsey Williams         (Date)
Counsel for Defendant Jonathan Lawrence


_____  11-16-18
Jonathan Lawrence                (Date)
Defendant